1812.

Sunbury,
Saturday,
June 13.

## Lessee of MACLAY against WORK and another.

### IN ERROR.

Before the recording act of 1775, no man was obliged to record his deeds. The purchaser was to look to the title at his peril; and notwithstanding he obtained a patent from the commonwealth, before notice that the warrant and survey, or a part of it, had been conveyed to a third person, yet this did not avoid the third person's title.

The principles of the law of England, must not be applied in their full extent to the case of a legal estate acquired in this commonwealth by patent. The question here is generally, not who has got the patent, but who on principles of law and equity ought to have had it, when it issued. It is not true that he who obtains a patent, shall avoid all titles by warrant and survey of which he has no notice; for a warrant and survey are in most respects considered as a legal estate, except as against the commonwealth. They are subject to the same laws of descent, devise and conveyance as the legal estate. They are subject to dower and curtesy; and an ejectment may be maintained on them.

The proceedings before the Supreme Court, under the act of the 6th of March 1778, by a person claiming an interest in an estate alleged to be forfeited, though conclusive against all persons claiming under the commonwealth by virtue of the attainder, are not so against persons claiming paramount the attainder.

THIS was an ejectment in the Common Pleas of *Mifflin* County, for the moiety of a tract of 412 acres 158 perches of land in *Union* township.

The plaintiff gave in evidence a warrant in the name of *Casper Weitzell,* for 275 acres, dated the 24th of *February* 1773, and a survey of 412 acres 158 perches, made on the 12th of *May* 1773. *Weitzell,* on the 17th of *March* 1773, conveyed three warrants, of which the above was one, to *John Whitmer* and *Christian Voght,* who on the same day conveyed one moiety of the same warrant, to *William Maclay,* the lessor of the plaintiff.

The defendants, whose title had the same origin with the plaintiff's, gave in evidence a patent to *Whitmer* and *Voght,* for the tract above-mentioned, dated the 15th of *March* 1774, and a deed in consideration of 200*l.* from them to *Nathan Patton,* under whom the defendants claimed, for the whole tract, dated the 23d of *May* 1775.

By the parol evidence, it appeared that *William Maclay* had given *Weitzell* a description of three tracts of land, for which the latter was to take out warrants, and *Maclay* was to have half. That accordingly *Weitzell* had taken out the warrants, sold them to *Whitmer* and *Voght,* and obtained a conveyance of one half from them to *Maclay,* on the day he conveyed to them; but no communication took place between *Maclay* and those persons at the time of the conveyance; or until after the patent was taken out. He was not consulted about taking out the patents. *Maclay's* deed was not put on record; and *Patton* was a purchaser for a valuable consideration, and without notice.

To support his title, the plaintiff also produced the record of the petition of *William Maclay* to this Court, on the 2d of *May* 1780, claiming a moiety of this land, which had been seized as belonging to *Voght*, and forfeited by his attainder for treason, upon which this Court had proceeded in a summary way agreeably to the act of the 6th of *March* 1778, 1 *Smith's Laws* 458, and had decreed the claim to be just and legal.

1812.

Lessee of MACLAY *v.* WORK.

The counsel for the defendants prayed the opinion of the court to the jury on the following points:

1. Whether the proceedings of the Supreme Court on the petition of *William Maclay* in *May* 1780, could have any effect on the title of *Nathan Patton's* heirs, who had no notice, and were not parties to their proceedings?

*By the Court.* We are of opinion, these proceedings cannot affect the title of *Patton's* heirs.

2. Whether *William Maclay*, having made the discovery of the location to *Weitzell*, and *Weitzell* having transacted the whole business with *Whitmer* and *Voght* in the absence of *Maclay*, and *Maclay's* title being acquired by the acts and agreements of *Weitzell*, *Maclay* is not bound by the acts and conduct of *Weitzell*, as much and as fully as if he had personally done all that was done by *Weitzell?*

We answer that *Maclay* is affected by the acts of *Weitzell*.

3. Whether the purchaser of the tract of land in question patented to *Whitmer* and *Voght*, who paid his money and got his conveyance, can be affected by any title which *Maclay* had in that patent, and land contained in it, by virtue of the deed to him read in evidence, which title neither appeared on the records of the land office, nor on the records of the county, and of which the purchaser had no notice?

The purchaser cannot be affected.

4. Whether *Patton*, having paid his money and got his conveyance, without notice of *Maclay's* claim, can be affected by any subsequent notice of *Maclay's* title?

*Patton* cannot be affected by subsequent notice.

These opinions were expressed by the two associate judges. The president (*Walker*) concurred in the first, and fourth, agreed so far in the second, as that *Maclay* was bound by the acts of *Weitzell*, until he got his deed for one

half the land from *Whitmer* and *Voght*, but totally dissented from the third.

The questions were brought up by a bill of exceptions to the charge of the court, and were argued by

*Hale* and *Watts* for the plaintiff in error, and by

*Huston* and *Duncan* for the defendants in error.

TILGHMAN C. J. The Court of Common Pleas delivered an opinion on three points, which are now the subject of consideration. I will first consider the second and third points, which are in some measure connected and run into each other. *William Maclay* furnished *Casper Weitzell* with a description of three tracts of land for which the warrants were to be taken out by *Weitzell*. It is not in proof what consideration passed between *Maclay* and *Weitzell*, but it appears that *Maclay* was to have half of the lands. On the 24th *February* 1773, the warrants were taken out, and a survey of the tract in question, containing 412 acres 158 perches, was made and returned the 12th of *May* 1773. On the 17th of *March* 1773, *Weitzell* conveyed his right to the three warrants to *John Whitmer* and *Christian Voght*, who, on the same day, conveyed a moiety of the whole to *William Maclay*. It appears by the deposition of *Voght*, that the agreement made with *Weitzell*, was that *Whitmer* and *Voght* were to take out warrants for the land, and convey one half to *Maclay*. After the conveyance to *Maclay*, on the 15th of *March* 1774, *Whitmer* and *Voght* took out patents for the three tracts in their own names, and on the 23d of *May* 1775 they conveyed the *whole* of the tract in dispute to *Nathan Patton*, under whom the defendants claim. It does not appear that *Whitmer* and *Voght* had any communication with *Maclay*, at the time of their contract with *Weitzell*, or at any other time, until long after the patent was taken out, or that they ever received from *Maclay*, directly or indirectly, any authority to take out the patents in their own names. That a principal is bound by the acts of his agent, there is no doubt. How far a man is agent for another, is matter of fact, and when the jury have ascertained the fact, the conclusion follows of course. If *Maclay* had authorized *Whitmer* and *Voght* to take patents for the whole in their

own names, in confidence that they should convey· a moiety to him, after they had received the patent, and they had deceived him, and conveyed the whole to a purchaser for a valuable consideration without notice, the purchaser would have held against *Maclay*, and he must have looked to those in whom he had placed trust, for indemnification. But it is not to be taken as a legal inference that he authorized *Whitmer* and *Voght* to take out patents, merely because. he trusted to *Weitzell* to take out the warrants. *Weitzell* appears to have been true to his trust, for, although he conveyed the warrants to *Whitmer* and *Voght*, he took care that they should immediately convey a moiety to *Maclay*, and both these conveyances are to be taken as one transaction. It is objected that *Maclay*, by not applying for a patent for his moiety, or recording his deed, left it in the power of *Whitmer* and *Voght*, to procure the legal title, and deceive innocent purchasers. But it is very material, that when *Maclay* obtained his deed, there was no law obliging him to put it on record, and the same objection lies against every one, who, at that period, purchased a *legal* estate, and did not record his deed; for he left it in the power of the seller to defraud purchasers, without a possibility of notice. Yet it is certain that before the recording act of 1775, no man was obliged to record his deeds, and the purchaser was to look to the title at his peril. A very great defect it was, but so was the law. As to the circumstance in this case of ·the purchaser having acquired the legal estate, we must 'not apply the principles of the *English* law in their full extent, to the case of a legal estate acquired in this commonwealth by patent. Land to a vast amount has· been held' for a great length of time without patent, and it would have ruinous consequences, if it were established, that he who first got hold of the patent, should avoid all titles of which he had no notice. Patents are often obtained without much enquiry into the title. It has been the custom to suffer their validity to be contested, and when the litigant parties appear in a court of justice, the question generally is, not .who has got the patent, but who was entitled to it on 'principles of law and equity, at the time it was issued. I say this is generally the question, but I.must not be understood as laying down an uni﹢versal rule, not to be affected by gross negligence or other

misconduct of the parties. An estate held by warrant and survey, or other imperfect title without patent, is of a singular nature. In many, and indeed in most respects, it is considered as a legal estate against all persons but the commonwealth. It is subject to the same laws of descent, devise and conveyance as the legal estate. Tenancy by the curtesy and in dower are attached to it. An ejectment may be supported on it. It is unreasonable therefore to confine *William Maclay* to a greater degree of strictness as to recording his deed, than if he had been the holder of the legal estate; or to raise a legal presumption that *Whitmer* and *Voght* were his trustees for the purpose of obtaining a patent, merely because he did not apply for a patent himself. This is the extent to which the law was carried by the Court of Common Pleas, and I think their opinion was erroneous.

The next point to be considered, respects the consequences of the proceedings of the Supreme Court on the petition of *William Maclay*, under the act " for the attainder of divers traitors," &c. passed the 6th of *March* 1778, 1 *Dall. St. Laws* 750. These proceedings were instituted to protect the estate of *Maclay*, against the forfeiture incurred by the attainder of *Voght*. They were conclusive against all persons claiming under the commonwealth by virtue of the attainder, but could have no effect on the heirs of *Patton*, who were not before the court, and claimed by title paramount. The object of this act was to secure those persons who purchased under the commonwealth, against all claims to estates seized and sold as the property of traitors. For this purpose, it was necessary that these claims should be brought forward in a short time, and decided in a summary manner. If, after the allowance of *Maclay's* claim to a moiety, the officers of the commonwealth had proceeded to sell the other half, the purchasers would have held against the heirs of *Patton*. But it was not within the scope of the law, that the Supreme Court should decide, except between the commonwealth and those who preferred claims against the confiscated estates. I am therefore of opinion, that on this point, the Court of Common Pleas decided rightly, but for the error in the other points, the judgment should be reversed, and a *venire facias de novo* be awarded.

YEATES J. It appears to me, that the proceedings in the Supreme Court, on the claim of the lessor of the plaintiff, were evidence merely to shew that he prosecuted his pretensions to one moiety of the lands in question, but had no conclusive effect on the title of the heirs of *Nathan Patton,* who were not parties to those proceedings. Whether *Patton* was living or not, or whether his children were minors in *May* 1780, when the decree was made, does not appear. But it is the manifest intention of the fourteenth section of the Attainder Act of 6th March 1778, to give a summary jurisdiction to the justices of this court, to enquire into claims made against the estates of persons attainted in pursuance of that act, and to decide thereon, for the protection of persons purchasing from the agents of forfeited estates. It was designed to prevent fraudulent conveyances and improper dispositions made by the traitors; and if their lands were sold by the agents, they passed to the purchasers, freed from the pretensions of persons claiming under such traitors, but not of those claiming by paramount title. It never was intended, that when the commonwealth did not insist on a forfeiture, a decision made on the petition of one person against the agents, should have effect against other persons unrepresented and unheard. If I may be indulged in conjecture, I should suppose that the sale to *Patton* was known at the time of the decree; otherwise the agents would have proceeded to sell the remaining interest of *Voght* in this tract of land.

It is perfectly clear, that the acts and agreements of *Casper Weitzell* as agent of *William Maclay,* were binding upon his principal. Nothing however has been done by the former, prejudicial to the interest of the latter, having acted with the most perfect good faith towards him. It appears by the evidence given on the trial, that *Maclay* furnished the discovery of 700 acres of vacant land, and that *Weitzell* was to take out the warrants for their joint benefit. *Weitzell* transferred his interest in this partnership to *John Whitmer* and *Christian Voght,* but was not unmindful of the obligations incumbent upon him. On the 24th of *February* 1773, three warrants were taken out:—One in the name of *Casper Weitzell* for 275 acres, one other in the name of *Whitmer* for 300 acres, and one other in the name of *Voght* for 125 acres.

On the 17th of *March* 1773 *Weitzell* conveyed the warrant issued in his name to *Whitmer* and *Voght* in consideration of 25*l.*, and on the same day, *Whitmer* and *Voght* by deed with proper recitals, convey the undivided moiety of the three several warrants to *Maclay* in fee. This was done in the absence of *Maclay.* The deed was not recorded, nor did any existing law make it necessary to register it. Upon the 15th of *March* 1774, a patent issued to *Whitmer* and *Voght* for the three tracts of land, and on the 23d of *March* 1775, they sold and conveyed the tract of land for which a warrant had issued in the name of *Casper Weitzell,* to *Nathan Patton* and his heirs, in consideration of 200*l.*, with covenant of *general* warranty. On these facts, two of the judges below, against the opinion of the president of the district, delivered it in charge to the jury, that *Patton* and his heirs could not be affected by any title which *Maclay* had in the land by virtue of his deed, which title neither appeared on the records of the land office, nor on the records of the county, and of which *Patton* had no notice. This opinion has been attempted to be justified, upon the grounds that *Whitmer* and *Voght* were the agents of *Maclay,* and substituted as such by *Weitzell,* for the purpose of patenting the land in the office; and that this mode of procedure having led to the injury and deceit of *Patton,* an innocent purchaser, those who reposed the trust in *Whitmer* and *Voght,* ought to suffer by their improper conduct. The reasoning would have much force, if the facts would warrant the inference that *Whitmer* and *Voght* were the agents of *Maclay* to patent the lands. But neither the written nor parol evidence establishes the fact. *Weitzell* executed his authority with fidelity; but from aught we can learn, he was not directed to patent the lands, nor to authorise others so to do. *Maclay* was not present when the transfers were made. As tenant in common, his interests were considered by him as distinct from his co-tenants, and he appointed *William Brown* his agent. We look in vain into the testimony, to discover any recognition by *Maclay,* either by word or deed, of the agency of *Whitmer* and *Voght.*

How far a purchaser *bona fide,* without notice of a legal estate, shall be protected, has been often agitated, and under certain circumstances he has prevailed amongst us. But that the conveyance of a title by patent will draw after it all the

consequences of the transfer of a legal estate in *England*, I
totally deny. There, a party claiming by an equitable right,
can neither recover nor defend himself against the person
holding the legal estate. Here, daily experience demonstrates,
that recoveries may be had and defences set up against the
patentees, their heirs and assigns, under an equitable imper-
fect title, even by settlement and improvement. It has been
correctly admitted by the counsel for the defendants, that
the true point of enquiry amongst us, is, who *ought* to have
the patent under all the merits of the case; and not, who has
it at the time of trial. From our local situation, our laws
and customs differ in many particulars from those of *Eng-
land*. A first mortgagee, suffering the title deeds of the
estate to remain in the hands of the mortgagor, who after-
wards executes a second mortgage, shall be postponed in
*Great Britain;* but the case has been decided otherwise here,
on solemn argument.

It has been urged here, that the heirs of *Patton* ought to
prevail, because their ancestor bought the patent right to
the lands, without notice either express or implied of the
title of *Maclay* to one moiety thereof. By what law was the
latter compelled to put his deed upon record? None. It was
a defect in our code, that such obligation was not imposed
on a grantee, until the supplement to the recording act was
passed on the 18th of *March* 1775. What laches or neglect
could justly be imputed to *Maclay?* None. He appointed an
agent to superintend his interests in this farm. He prosecut-
ed his claim thereto, when the right of *Voght* was considered
to be forfeited by his attainder. *Patton* was subjected to no
other risks than purchasers in general, who at their own
peril were bound to look to and guard against former sales
of their grantors. He chose his own mode of security, and
his heirs must recur to that alone: a covenant of general
warranty has been inserted in his deed, on which a suit may
hereafter be brought, in case of an eviction as to part of the
lands.

I am of opinion that the majority of the judges of the
Court of Common Pleas erred, when they asserted that the
title of *Nathan Patton* could not be affected by the opera-
tion of the unrecorded deed to *Maclay;* that the judgment

Lessee of
MACLAY
v.
WORK.

below be reversed, and that a *venire facias de novo* be awarded.

BRACKENRIDGE J. having been unable to attend the argument, gave no opinion.

Judgment reversed and *venire de novo*.